# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 30, 2022

Lyle W. Cayce
Clerk

No. 21-50518

United States of America,

*Plaintiff—Appellee*,

*versus*

Santiago Cordova-Espinoza,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 4:20-CR-330-1

Before King, Duncan, and Engelhardt, *Circuit Judges*.

Per Curiam:

Santiago Cordova-Espinoza appeals the district court's denial of a motion to suppress evidence obtained by federal agents after a hotel manager opened the door to a room containing Cordova. The district court properly found that this search was a private search. As private searches do not implicate the Fourth Amendment, the district court correctly denied Cordova's motion to suppress evidence obtained from the search in question. We therefore AFFIRM.

No. 21-50518

## I.

Santiago Cordova-Espinoza ("Cordova"), a Mexican citizen, entered the United States without authorization. He was found at the OYO Hotel in Alpine, Texas, when the hotel's manager opened the door to Cordova's room in front of Department of Homeland Security ("DHS") agents. Cordova was charged with illegal reentry under 8 U.S.C. Section 1326. He then moved to suppress the fruits of the hotel-room search, arguing that the hotel manager was acting as a Government agent and that the Government lacked a warrant that authorized the search. The district court held a suppression hearing and denied the motion. Cordova thereafter pleaded guilty to illegal reentry under 8 U.S.C. Section 1326, reserving his right to challenge the district court's denial of his motion to suppress.

The suppression hearing produced the following facts. Based on information from other sources reporting multiple undocumented immigrants gathering at the OYO Hotel, six Border Patrol agents went to the hotel. Two agents entered the OYO Hotel's office and spoke to the desk attendant before ultimately speaking with the hotel's owner and manager, Yogesh Patel. An agent explained to Patel why the agents were there and asked for details regarding Room 115, where it was believed the undocumented immigrants were residing. This agent did not ask Patel to open the door to Room 115, but Patel offered regardless. In response, the agent told Patel "no, [and] that [he] needed to go speak with [his] supervisor first." The two agents then left the office and returned to the other agents in the parking lot outside of Room 115.

Outside Room 115, the agents attempted to knock on the door four or five times, but the occupants did not open the door. Patel then approached an agent in the parking lot and asked him if the agents "wanted in the room." This agent responded: "Well, we've attempted a knock and talk, but nobody

has answered. Outside of that, there is nothing we can do without a warrant." The agent "explained to [Patel] that the occupants, whoever has rented the room, have a reasonable expectation of privacy from the government." The agent was confident he had told Patel that he needed either consent or a warrant to open the door, but he was unsure whether he clarified that he needed the occupants' consent or Patel's consent. Then, according to the agent, "in the middle of this conversation . . . [Patel] just walked past me and basically left me standing there, opened the door [to Room 115], turned around, and walked away leaving the door wide open exposing . . . two individuals in the room."

Patel described his opening the door in some detail. He explained that he saw "that [the agents] were struggling. So [Patel had] the right to open [Patel's] room; right. So [he] opened the 115 for them." He said that the agents never asked him to open the door but did tell him that they may "go for the warrant. They would go before a judge," which would be "a long process for [the agents] to open the room and break the door." Patel also cited several reasons for opening the door. Principally, he said it was because he "saw that the officers were struggling" and wanted to help them. But he also noted that he was "concerned illegal activity was taking place" in the room and that he did not want the agents to break his door. When asked whether he told the agents that he planned to open the door, Patel ultimately testified that he had, though he could not recall which agent he told. No agent reported being told that Patel was going to open the door or asking Patel to open the door. And no agent reported encouraging Patel to open the door or compensating Patel for doing so.

As Patel walked toward the door, an agent followed Patel at an approximately ten-foot distance but was unsure whether Patel intended to open the door or just knock on it. No agent attempted to stop Patel from acting while he walked toward the door. After Patel opened the door, several

No. 21-50518

agents observed two individuals, one of whom was Cordova, in the room. Upon approaching the entrance of the door and eventually entering the room, they also found pizza, water, soft drinks, and some wet clothes.

Cordova moved to suppress evidence obtained from this search and argued that Patel was acting as a Government agent when pursuing this warrantless search. In determining whether Patel acted as an agent of the Government, the district court applied the test set out by the Ninth Circuit in *United States v. Miller*, 688 F.2d 652 (9th Cir. 1982).[1] That test has two factors: "(1) whether the Government knew or acquiesced in the intrusive conduct; and (2) whether the private party intended to assist law enforcement efforts or to further his own ends." *United States v. Blocker*, 104 F.3d 720, 725 (5th Cir. 1997). As to the first factor, the court concluded that the Government did not know about or acquiesce in the conduct because, per the agents' testimony, Patel acted without warning, and the agents did not expect Patel to open the door. As to the second factor, the court concluded that Patel—despite stating that he wanted to assist the DHS agents—was acting to further his own ends as he wanted to prevent damage to his door and wanted to halt illegal activity at his hotel. Thus, the court denied the motion to suppress.

Cordova timely appeals, arguing that the district court erred when it concluded that Patel was not acting as the Government's agent when he opened the door.

---

[1] The two factors used in the *Miller* test were first elucidated by the Ninth Circuit in *United States v. Walther*, 652 F.2d 788 (9th Cir. 1981), but for present purposes, we will follow the convention of the parties and district court in referring to this as the *Miller* test. *See* Eugene L. Shapiro, *Governmental Acquiescence in Private Party Searches: The State Action Inquiry and Lessons from the Federal Circuits*, 104 KY. L.J. 287, 290 (2016) (explaining the Ninth Circuit approach).

## II.

"On appeal from the denial of a motion to suppress we review the district court's factual findings under the clearly erroneous standard and its conclusions of law *de novo*." *Blocker*, 104 F.3d at 725 (quoting *United States v. Johnson*, 16 F.3d 69, 71 (5th Cir. 1994)). We treat "the district court's determination whether a person is acting as an agent for the Government as a factual finding." *Id.* Clear error exists only if, after viewing all the evidence, the court is "left with the definite and firm conviction that a mistake has been committed." *United States v. Charon*, 442 F.3d 881, 891 (5th Cir. 2006) (quoting *United States v. Harris*, 434 F.3d 767, 773 (5th Cir. 2005)).

The Fourth Amendment's protection against the unreasonable search of a person's home also protects guests staying in a hotel room. *Stoner v. California*, 376 U.S. 483, 490 (1964). Thus, the Government cannot engage in a warrantless search inside a guest's hotel room, even with the hotel owner's permission, unless an exception to the warrant requirement applies. *Id.* at 486–88. Evidence obtained in a wrongful search or seizure by a *private* party, however, does not violate a person's rights under the Fourth Amendment. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). But, of course, the Government cannot use private individuals as agents to circumvent Fourth Amendment protections. *See United States v. Mekjian*, 505 F.2d 1320, 1327 (5th Cir. 1975). Thus, the question is one of agency, or whether, when Patel opened the hotel door, he "must be regarded as having acted as an 'instrument' or agent of the state." *United States v. Bazan*, 807 F.2d 1200, 1202 (5th Cir. 1986) (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 487 (1971)).

The parties here dispute the proper test we should apply to decide whether Patel acted as an agent of the state. Cordova argues that this circuit has applied the two-factor *Miller* test in the past (including in *Bazan*) to

determine whether an individual was acting on behalf of the state. *See, e.g.*, *Bazan*, 807 F.2d at 1202–04; *Blocker*, 104 F.3d at 725. In response, the Government argues that this circuit has not yet adopted a single test. Instead, the Government argues that we should consider multiple factors to determine whether a private party acted as an agent of the state. One expression of these factors also (confusingly) comes from *Bazan*, which, per the Government's view,[2] created a separate, three-factor test later applied by this circuit.[3] *See, e.g.*, *United States v. Dahlstrom*, 180 F.3d 677, 682 (5th Cir. 1999); *United States v. Ramirez,* 810 F.2d 1338, 1342 (5th Cir. 1987). These *Bazan* factors require us to find a private party was not a Government agent when: (1) the Government has offered no form of compensation to an informant; (2) the Government did not initiate the idea that the informant would conduct a search; and (3) the Government lacked specific knowledge that the informant intended a search. *Bazan*, 807 F.2d at 1204. The parties disagree as to whether we should apply the two factors from *Miller* or the three factors from *Bazan*. Caselaw from our circuit is also somewhat inconsistent on this question; we have applied both tests in the past but have not formally adopted one to the exclusion of the other.[4]

---

[2] It is unclear from the briefing whether the Government is necessarily suggesting we apply the three *Bazan* factors as a separate test here or merely as a guide to analyzing particularly salient factors under a more general totality-of-the-circumstances approach. Although we do not decide here which of the two approaches allegedly taken by the *Bazan* court is appropriate, we are almost certainly bound to one of these two approaches and thus decline to follow the Government's possible suggestion that we determine Patel's agency using a third totality-of-the-circumstances approach.

[3] Cordova argues that this three-factor test is not a separate test. He argues that said factors were "drawn from the circumstances specific to Bazan's case" and were "not meant to be a strict three-part test to be applied in all cases but rather examples of factors to consider."

[4] *Compare United States v. Meals*, 21 F.4th 903, 908 n.3 (5th Cir. 2021) (noting that we have not yet adopted a specific test), *with Blocker*, 104 F.3d at 725 (noting that we have

No. 21-50518

We need not resolve this disagreement because we affirm the judgment of the district court under either of the tests suggested by the parties. We thus do not decide here whether the three factors in *Bazan* are a test separate from the two-factor *Miller* test; similarly, we decline to opine on which of these two suggested approaches should control in future cases in this circuit. Under either of the suggested approaches, the district court did not err in finding that Patel was acting as a private party, and not as an agent of the state, when he opened the hotel room door. There was thus no search or seizure by Government officials that implicates the Fourth Amendment.

We initially consider the facts under the two-factor *Miller* test. The first factor requires us to consider whether the Government knew or acquiesced in the intrusive conduct. *Miller*, 688 F.2d at 657; *see also Bazan*, 807 F.2d at 1202–03. Such knowledge or acquiescence arises when the Government is either a direct participant or indirect encourager. *Miller*, 688 F.2d at 657. The district court did not identify, and the record does not show, any evidence suggesting conduct by the Government that would support a finding of direct Government participation. We must thus consider whether the Government indirectly encouraged the search.[5] The district court found that the Government did not. We agree.

---

"applied the test articulated by the Ninth Circuit in *United States v. Miller*"), and *Ramirez*, 810 F.2d at 1342 (applying the three factors from *Bazan*).

[5] We identify four separate arguments Cordova makes in suggesting the agents here indirectly encouraged Patel. None changes the outcome of our *Miller* analysis. First, the persuasive incentivization allegedly present in *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602 (1989), is distinguishable from the instant case. In *Skinner*, railroads were acting as agents of the Government under federal rules authorizing railroads to administer blood and urine tests on employees involved in safety violations. *Id.* at 609–12. But these rules preempted existing state laws and regulations covering similar subject matter and required employees to submit to tests or be withdrawn from covered service. *Id.* at 615. The present case involves both less comprehensive actions by the Government and far less

No. 21-50518

*Bazan*'s analysis of this first *Miller* factor is instructive. In *Bazan*, Garza (a private party) entered and searched Bazan's property. *Bazan*, 807 F.2d at 1202. Before he did so, Garza had twice spoken to the Drug Enforcement Administration ("DEA") about suspicious activity on the premises, previously acted as a police informant, previously worked as a deputy sheriff, and was asked by a DEA agent generally to "conduct surveillance on [Bazan's] ranch." *Id.* at 1203. Despite this degree of prior contact between the DEA agent and Garza, the *Bazan* court noted that the agent "had no reason to predict that Garza would enter the ranch, and he clearly did not request that Garza do so." *Id.* In other words, the agent "had no knowledge of what Garza would do or when he would act," which was

---

severe punishments for noncompliance, both of which indicate a far more limited and qualitatively different scope of Government action.

Second, Cordova suggests that we should apply a constructive knowledge standard here such that a private party is acting as a state agent when the Government knew or *should have known* that the private party would conduct the search. As evidence, he cites *Mekjian*, 505 F.2d at 1328. But we decline to read into the *Miller* factors an additional standard based on language from a case that did not specifically apply (and predates) *Miller*.

Third, Cordova argues that, in not affirmatively acting to stop Patel, the agents acquiesced in Patel's search. In the absence of supporting caselaw requiring such actions, we decline to impose into this circuit's *Miller* analysis a new duty on the Government to affirmatively stop a search, particularly in a case where, like here, said search happened rapidly and without the Government's prior knowledge.

Finally, Cordova notes that an agent explained to Patel that hotel occupants "have a reasonable expectation of privacy *from the government*" and that the agents thus needed consent to open the door. Cordova seems to suggest that this explanation was an impermissible veiled attempt at hinting to Patel that he should open the door, but we find the district court's characterization of this exchange as merely "informative" (i.e., not directive) to be plausible, supported by the record, and thus not clear error. Additionally, any possible discrepancy noted by Cordova between the record and the district court's findings about who an agent said needed to give consent (i.e., the manager or the room's occupants) to search is not relevant here because such a discrepancy does not ultimately change the informative nature of the conversation between the agent and Patel.

sufficient to find a lack of Government knowledge or acquiescence in Garza's search. *Id.* at 1204.

In the instant case, the district court correctly found that the Government had no prior knowledge of and no participatory role in Patel's search. The agents here thus had even less knowledge and acquiescence than the agent in *Bazan*, who suggested generally to the neighbor that he conduct surveillance. *Id.* at 1203. By contrast, the district court found that "all agents credibly testified that they did not know Mr. Patel would open the door," a finding supported by the testimony of agents that they were surprised to see Patel opening the door.[6] Additionally, the record shows that the agent told Patel not to open the door until the agent had heard from his supervisor. This testimony can also be fairly read as indicating a lack of Government acquiescence in the search. The district court thus correctly found that the Government did not affirmatively encourage Patel to open the door and thus did not acquiesce to Patel's search. These findings are supported by the record and, given that the district court was in the best position to evaluate the credibility and context of witness statements, are not clearly erroneous. *See Mekjian*, 505 F.2d at 1328 ("The meaning of the statements made [by a private party] with regard to promises to send information [to the Government] depend upon the context in which they were made and the credibility of witnesses. This appraisal was a role most appropriate for the trial judge."). The Government thus did not have the necessary knowledge

---

[6] Cordova notes that Patel mentioned to an agent that he would open the door, testimony that the district court also described in a footnote as "credible." Although this testimony would seem to contradict the district court's factual finding that the agents did not know Patel would open the door, one possible explanation is that Patel told this to the agent, who then told Patel that he would need to speak to his supervisor first about getting a warrant. The agent could have then been surprised when Patel opened the door before the agent could get a warrant. Given such a possibility, we cannot say that the district court clearly erred in finding that the agents did not know Patel would open the door.

or acquiescence in the instant case for this search to implicate the Fourth Amendment.

The next factor under *Miller* is whether the private party intended to assist law enforcement efforts or to further his own ends. *Miller*, 688 F.2d at 657. Mixed motives—where a private party has both a personal motive and an intent to aid the Government—do not necessarily compel a finding of Government involvement in a search. *See Bazan*, 807 F.2d at 1204. The district court found that Patel was motivated at least partly by a desire to help himself. We agree.

In *Bazan*, the court suggested that Garza (the private party) had a personal motive for conducting a search of the relevant property. The property had once belonged to the family of Garza's wife, and the property owner suggested that Garza may have aided the authorities in their investigation out of a hope of regaining the property. *Id.* at 1204. The *Bazan* court explained that such personal motives are especially likely to exist in instances where, as in the present case, the Government does not offer any compensation for the private party's efforts in aiding a search. *Id.*

Here, Patel was similarly motivated, in part, by a private interest in protecting and maintaining his property. He was concerned that illegal activities were happening in his hotel and that the agents would break down his door, either of which is a reasonable—and, more to the point, personal— motivation for a hotel manager to have for opening a hotel room. Furthermore, an agent testified that he told Patel not to open the door until the agent had heard from his supervisor. The fact that Patel did so before the agent had heard back also suggests that Patel had an independent, personal motive in opening the door beyond just assisting the agents in their investigation. The district court thus did not clearly err in concluding that Patel's private, personal interests in conducting the search precluded a

finding of state involvement. In sum, both prongs of the *Miller* test indicate that Patel was acting as a private party, not as an agent of the Government.

We next consider the three-factor test from *Bazan*. As the *Bazan* court considered these factors in conjunction with its *Miller* analysis, our discussion of the *Miller* factors unsurprisingly weighs heavily in our *Bazan* analysis. First, we consider whether the Government offered any compensation to Patel to open the door. The district court found that it did not, and no record evidence indicates otherwise. Second, we consider whether the Government or the private party initiated the idea of conducting a search. This analysis tracks closely to the first *Miller* factor. As discussed, the record supports the district court's finding that there was no insinuation from the Government that Patel open the door. Third, we consider whether the Government lacked specific knowledge that the informant intended a search. The district court credited testimony from agents asserting no prior knowledge of Patel's opening the door. The record supports this finding. Thus, even applying the *Bazan* court's three factors as a separate test yields the same result: Patel was acting as a private party, not a Government agent. Consequently, there was insufficient Government involvement in this case to constitute a state search implicating the Fourth Amendment.[7]

### III.

This circuit has taken various approaches in deciding whether a private party acts as a Government agent when conducting a search. In the

---

[7] As we hold that the Fourth Amendment's prohibition against warrantless searches is inapplicable to Patel's search, we need not address Cordova's arguments concerning the types of evidence properly excludable from a search violating the Fourth Amendment. Similarly, we do not credit Cordova's argument that the agents participated in an illegal search by looking around *after* Patel opened the door. *See Mekjian*, 505 F.2d at 1328 (finding no Fourth Amendment violation in Government accepting records from private individual after individual's search was held to be purely private).

instant case, Patel did not act as an agent under any of these various approaches; as such, we decline to specify a single approach this court must use in future cases. Regardless of whether we look to the *Miller* test or the supposedly distinct *Bazan* factors, the district court did not clearly err in determining that Patel was not acting as an agent of the Government. As such, the Fourth Amendment's protection against unreasonable searches is inapplicable here for lack of Government involvement in the search. The Government can thus properly use the evidence adduced by Patel's opening the door, and Cordova's motion to suppress such evidence was properly denied by the district court.

For the foregoing reasons, we AFFIRM.